# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ADVANCE SIGN GROUP,
L.L.C.,

             **Plaintiff,**

    v.

OPTEC DISPLAYS, INC.,
       **Defendant.**

Case No. 2:07-CV-380

JUDGE SARGUS

MAGISTRATE JUDGE KEMP

## OPINION AND ORDER

Presently pending before the Court are Defendant's Motion for Judgment as a Matter of Law (Doc. 134), Defendant's Motion for a New Trial or, in the Alternative, for a Remittitur on Damages (Doc. 135), and Plaintiff's Motion to Amend Judgment to Include Prejudgment Interest (Doc. 137). For the reasons stated herein, Defendant's motion for judgment as a matter of law is **DENIED**; Defendant's Motion for a new trial is **DENIED**; and Plaintiff's motion for prejudgment interest is **GRANTED**.

## I.

This case is a commercial dispute. Plaintiff Advance Sign Group, LLC ("Advance Sign") brought claims against Defendant Optec Displays, Inc. ("Optec") for breach of contract (Counts One and Two), unjust enrichment (Count Three), and tortious interference (Count Four). Optec, in turn, advanced counterclaims for breach of contract, account, detrimental reliance, and unjust enrichment.

Advance Sign is in the business of manufacturing, installing, and servicing commercial signage. Optec is a manufacturer of a type of commercial sign known as an electronic messaging center ("EMC" or "EMCs"). The dispute between the Parties began in 2005.

Advance Sign alleged that, at that time, its President James Wasserstrom ("Wasserstrom"), entered into a contract with Bill McHugh ("McHugh"), then Optec's Vice President of Sales, whereby Optec and Advance Sign would partner to sell EMCs manufactured by Optec to Advance Sign's customers in the foodservice industry. Specifically, Optec would sell the EMCs to Advance Sign at a discounted price, Advance Sign would agree to only sell Optec EMCs, and Optec would agree not to sell directly to the foodservice companies introduced to Optec by Advance Sign. According to Wasserstrom, he envisioned Advance Sign providing an entire "turn key" solution to the foodservice companies with regards to the EMCs, wherein Advance Sign would not only provide installation services, but would also assist the customers in managing the content of the EMCs from a centralized location.

Among Advance Sign's foodservice costumers was the Sonic Restaurants ("Sonic") fast food chain. In late 2005, Advance Sign and Optec participated in a pilot project at several Sonic locations owned by franchisee Darrell Rogers ("Rogers") in Topeka, Kansas. The purpose of the pilot project was to determine whether use of the EMCs could result in increased sales at the particular Sonic locations. Following the success of the pilot program, Sonic became interested in the EMCs for both the locations that it owned directly and for its other franchisees.

During the first quarter of 2006, Wasserstrom learned that Sonic and Optec were negotiating directly for the sale of EMCs by Optec to Sonic, in violation of the contract Wasserstrom claims Advance Sign entered with Optec in 2005. In order to salvage the situation with Optec, Advance Sign claims that a second contract was entered by the Parties in the spring of 2006 whereby Optec, through McHugh, agreed to pay Advance Sign group a commission of 12% of the net invoice price on all sales made by Optec to the foodservice customers introduced to Optec by Advance Sign. When McHugh would not sign a written form of this agreement,

2

Wasserstrom and his associates, Nancy Wasserstrom and Roger Wallace, traveled to California in August 2006 and met with McHugh, Optec President Shu Wu ("Wu"), and Shawn Klinger, another senior Optec employee. Advance Sign claims that, as a result of this meeting, Optec agreed, inter alia, to pay Advance Sign a 2% commission on all gross sales by Optec to Sonic. Advance sign asserted that Optec failed to pay the commissions required under either of the two iterations of the second contract.

Following trial, the jury found in favor of Advance Sign on both of its breach of contract claims and its claim for tortious interference. The jury awarded Advance Sign damages of $3,444,000 on the second contract claim and $1,029,000 on the tortious interference claim. (*See* Doc. 122.) Additionally, the jury found in favor of Optec on its counterclaims for breach of contract and account, and awarded damages of $46,728.51 on the account counterclaim.

Presently pending before the Court are various post-trial motions.

## II.

The Court first addresses Optec's motion for judgment of a matter of law, which seeks judgment as a matter of law as to Advance Sign's second breach of contract claim and tortious interference claim. Pursuant to Rule 50:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

FED. R. CIV. P. 50(b). During trial, the Court denied Optec's oral Rule 50(a) motion, and Optec has timely renewed that motion pursuant to Rule 50(b).

An award of judgment as a matter of law on a particular claim or issue is appropriate if the Court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on that claim or issue. FED. R. CIV. P. 50(a). The Court's inquiry in analyzing a motion for judgment as a matter of law is the same as the inquiry for resolving a motion for summary judgment. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 794 (6th Cir. 2004) (en banc). The Court must "review all of the evidence in the record in the light most favorable to the nonmoving party and determine whether there was a genuine issue of material fact for the jury." *Id.* Additionally, the Court must "draw all reasonable inferences in favor of the prevailing party," and refrain from weighing the evidence or making credibility determinations. *Id.* The Court must, however, give credence to "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 795 (quotations omitted).

## A.

Optec advances three arguments to support its position that judgment as a matter of law is appropriate on Advance Sign's second contract claim. First, Optec argues that the statute of frauds bars the enforceability of the second contract. Second, Optec asserts that the jury was precluded from awarding Optec damages on the second contract claim after also finding in favor of Optec on the first contract claim. Third, Optec contends that the manifest weight of the evidence precluded Advance Sign's victory on that claim.

## 1.

In Ohio, the general statute of frauds is codified in § 1335.05 of the Revised Code, which provides in part that:

> No action shall be brought whereby to charge the defendant . . . upon an agreement that is not to be performed within one year from the making thereof [ ]

4

unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

OHIO REV. CODE § 1335.05. Optec contends that because no signed writing evidencing the

second contract exists and the terms of the contract could not be performed within one year, the

statute of frauds precludes enforcement of the contract.

The Supreme Court of Ohio has interpreted the statute of fraud's one-year provision

narrowly. In *Sherman v. Haines*, 652 N.E.2d 698 (Ohio 1995), the Court stated:

The provision applies only to agreements which, by their terms, cannot be fully performed within a year, and not to agreements which may possibly be performed within a year. Thus, where the time for performance under an agreement is indefinite, or is dependent upon a contingency which may or may not happen within a year, the agreement does not fall within the Statute of Frauds.

*Id.* at 700. In accordance with *Sherman*, the Court instructed the jury that "[u]nder Ohio contract

law, an enforceable oral contract must be performed within one year from the making of the

contract. If you find that the contract was not capable of performance within one year, you may

not find in favor of Advance Sign Group as to that contract." (Doc. 119 at 23.)

Optec, however, now points to Ohio authority standing for the proposition that

agreements to pay commissions for an indefinite period of time come within the statute of frauds

as a matter of law, and thus must be evidenced by a signed writing. *See, e.g., Daup v. Tower*

*Cellular, Inc.*, 737 N.E.2d 128, 135–36 (Ohio Ct. App. 2000) (holding that "where a defendant's

obligation to perform under an oral agreement is contingent upon the future acts of a third party

and will continue for an indefinite period of time in the future, such contract falls within the

Statute of Frauds"). Optec argues that the Court must apply these authorities and now rule as a

matter of law that enforcement of the second contract is barred by the statute of frauds. The

Court declines to do so, first noting that other Ohio Court of Appeals cases suggest the opposite

5

of the proposition advanced by Optec, that indefinite contracts for commissions fall outside the statute of frauds. *See, e.g., Ford v. Tandy Transp., Inc.*, 620 N.E.2d 996, 1007–08 (Ohio Ct. App. 1993) (holding that contract to pay commissions on shipping contract fell outside statute of frauds).

Moreover, to the extent that Optec now essentially argues that the jury was improperly instructed regarding the application of the statute of frauds in Ohio, that argument is not properly raised in a Rule 50 motion. That is because Rule 50 motions test the sufficiency of the evidence presented to the jury. Accordingly, the Court will limit it inquiry to the question of whether the evidence supports the jury's conclusion that the second contract was capable of performance within one year. The Court finds that it does.

Wasserstrom testified that Plaintiff's Exhibit 32, a letter that was sent to McHugh but never returned and signed, represented the terms of the first iteration of the second contract. (*See* Doc. 142 at 82.) Similarly, Wasserstrom testified that Plaintiff's Exhibit 34, a letter he sent to Wu following the August 2006 meeting with Optec that was never signed and returned by Wu, contains the terms of the second iteration of the second contract. (*See* Doc. 142 at 85–86). For purposes of the Optec's motion for judgment as a matter of law, Wasserstrom's testimony and these exhibits must be construed in favor of Advance Sign. A review of Plaintiff's Exhibits 32 and 34 reveals that the terms of the arrangement were indefinite, and thus could have been performed within one year.

Exhibit 32 states that "Optec Displays shall pay Advance Sign Group commissions at the rate of twelve percent (12.0%) of the net invoice price for all Sonic sales made by Optec Displays to the customers identified above." (Pl.'s Ex. 32.) Exhibit 34 states that "Optec will pay Advance Sign a commission of two percent of any gross sales made by Optec to Sonic

6

Drive-ins, Inc., or to any Sonic franchisee." (Pl.'s Ex. 34.) Neither letter expressly states an end-date to the commission structures described within them. Furthermore, nothing would have made performance within one year impossible. In this regard, it would have been possible for Optec to sell a finite number of EMCs to Sonic during a one year period and then terminate its relationship with Sonic. Accordingly, evidence exists from which a reasonable jury could have rejected Optec's statute of frauds defense, and Optec's argument that judgment as a matter of law is appropriate based on the statute of frauds fails.

**2.**

Optec next argues that because the jury found in favor of Advance Sign on Advance Sign's first contract claim, judgment as of matter of law on the second contract claim is required. As previously noted, while the jury found in Advance Sign's favor on the first contract, the jury awarded zero damages on that claim. According to Optec, an award of damages on the second contract is inconsistent with the finding that Optec had breached the first contract. The Court disagrees.

Optec invokes the election of remedies doctrine. The elements that doctrine are: "(1) the existence of two or more remedies; (2) the inconsistency of such remedies; and (3) a choice of one of them." *Davis v. Rockwell Int'l Corp.*, 596 F. Supp. 780, 787 (N.D. Ohio 1984). Optec essentially argues that Advance Sign elected to pursue its contract claims in the alternative, which necessarily prohibited the jury from finding in favor of Advance Sign on both contract claims. In the Court's view, however, there is nothing inconsistent with the returned verdicts, as they are supported by the evidence Advance Sign offered at trial, especially given that the jury did not award damages on both claims. As noted by the Sixth Circuit, the election of remedies

doctrine "is remedial in nature and does no more than prevent double recovery." *Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 567 (6th Cir. 2001).

Once again, the Court looks to the testimony of Wasserstrom. He testified that, in the summer of 2005, Advance Sign, acting through himself, and Optec, acting through McHugh, entered into a contract whereby the two companies would partner to sell Optec EMCs to Advance Sign's customers in the foodservice industry. (*See* Doc. 142 at 25.) As part of that contract, Wasserstrom testified that "[McHugh] was not to contact [Advance Sign's customers] or get involved with them at all unless [Wasserstrom] was present." (Doc. 142 at 26.) Wasserstrom further testified that during the first quarter of 2006, he learned that Optec and Sonic, one of the customers Wasserstrom had introduced to Optec, were discussing an arrangement whereby Sonic would buy EMCs directly from Optec. (Doc. 142 at 74.) Construed in favor of Advance Sign, this evidence indicates a breach of the first contract's term precluding direct contact between Optec and Advance Sign's customers.

According to Wasserstrom, the second agreement, whereby Optec would pay Advance Sign commissions or a finder's fee, resulted in his efforts to "salvage the thousands of hours that I had in here and what my people had gone through to make this happen." (*See* Doc. 142 at 78.) Thus the second contract can be viewed as a settlement or novation of the first contract. Therefore, there is nothing inconsistent with the jury's finding that Optec breached both the first and second contracts, and the jury's award of damages on the second contract. In this regard, a reasonable interpretation of the evidence is that Optec breached the first contract by communicating directly with Sonic, but that Advance Sign suffered no damages as a result because of the existence of the second contract, which created a new obligation for Optec to

8

compensate Advance Sign. As Optec failed to do so, it was reasonable for the jury to award damages on the second contract claim.

**3.**

Finally, Optec asserts that the manifest weight of the evidence precluded a finding by the jury that the second contract was formed. Specifically, Optec argues that the jury ignored testimony of Wu and McHugh who denied that a final agreement was ever reached; that the jury must have added terms to the contract or ignored evidence of the terms of the contact; and that the jury ignored testimony of Roger Wallace, Advance Sign's chief financial officer.

As to Optec's contention that the jury only credited the self-serving evidence of Advance Sign's officers, and ignored the testimony of McHugh and Wu and that no contract had been formed, along with certain possibly contradictory testimony of Wallace, in considering a Rule 50 motion, the Court is precluded from weighing evidence and making credibility determinations. Moreover, the evidence must be construed in favor of Advance Sign, the nonmoving party. Viewing the evidence in this manner, the testimony of Wasserstrom that the contract existed must be credited, and the Court cannot balance that testimony against the contrary testimony of Wu and McHugh, which the Court notes is equally as self-serving. From Wasserstrom's testimony, the jury could reasonably have found in Advance Sign's favor.

The Court also concludes that sufficient evidence was offered from which the jury could arrive at the damage figure of $3,444,000. The Parties stipulated that Optec's total gross revenue from its relationship with Sonic was $33,404,036.60. (Pl.'s Ex. 72.) Optec argues that because neither 2% nor 12% of that amount would yield damages of $3,444,000, the jury must have added terms to the contract not agreed to by the Parties. However, as noted by Advance Sign, Wu testified that Optec had sold approximately 1400 EMCs to Sonic. (Doc. 136 at 38.) An

9

email from McHugh to Sonic dated November 30, 2006 indicates a price per EMC of $20,500.

(*See* Pl.'s Ex. 43.) Using these figures and the 12% commission purportedly agreed to in the first

iteration of the second contract, the jury could reasonably have arrived at the $3,444,000 damage

figure.

Accordingly, Optec's motion for judgment as a matter of law as to Count Two is denied.

**B.**

Turning to Advance Sign's claim for tortious interference, Optec seeks judgment as a

matter of law on the grounds that Advance Sign failed to establish the required elements of the

claim. The jury awarded damages to Advance Sign of $1,029,000 on the tortious interference

claim.

The Court's complete instruction to the jury on the tortious interference claim was as

follows:

> Advance Sign claims that Optec purposely interfered with Advance Sign's
> contractual and/or business relations with Sonic Restaurants, Inc., D.L. Rogers,
> and other Sonic franchisees by falsely representing to Sonic Restaurants, Inc.,
> D.L. Rogers, and other Sonic franchisees that Advance Sign improperly installed
> Optec's EMCs causing the EMCs to fail, and that Advance Sign was damaged as a
> result. Before you can find for Advance Sign on its tortious interference claim,
> you must find by the greater weight of the evidence that:
>
>> (1) there were existing or prospective contractual or business relationships
>> between Advance Sign and Sonic Restaurants, Inc., D.L. Rogers, and other Sonic
>> franchisees; and
>>
>> (2) Optec knew of the business or contractual relationships; and
>>
>> (3) Optec intentionally acted with the purpose to interfere with Advance Sign's
>> business or contractual relationships; and
>>
>> (4) Optec lacked a justification; and
>>
>> (5) Advance Sign was injured as a proximate result of the acts of Optec.

The term "business relationship" includes prospective contractual relations and continuing business or other customary relationships not amounting to a contract.

"Lacked a justification" means that Optec's interference with the business or contractual relationship was improper. In deciding whether Optec lacked a privilege, you should consider all the following factors:

    (A) the nature of Optec's conduct;

    (B) Optec's motive;

    (C) the interests of Advance Sign with which Optec's conduct interfered;

    (D) the interests sought to be advanced by Optec;

    (E) the social interests in protecting the freedom of action of Optec and the business interests of Advance Sign;

    (F) the proximity or remoteness of Optec's conduct to the interference; and

    (G) the relations between Advance Sign and Optec.

If you find for Advance Sign on its claim for tortious interference, you will decide by the greater weight of the evidence an amount of money that will reasonably compensate Advance Sign for the actual loss proximately and directly caused by Optec's interference with Advance Sign's contractual and/or business relations.

Advance Sign's loss is calculated by deciding what Advance Sign was entitled to receive had Advance Sign and Sonic Restaurants, Inc., D.L. Rogers, and other Sonic franchisees continued their contractual or business relationships. You should then add other damages, if any, suffered by Advance Sign as a result of Optec's improper interference. From this sum, you should subtract the amount, if any, that Advance Sign saved by not having to fully perform in the contractual and/or business relationships with Sonic Restaurants, Inc., D.L. Rogers, and other Sonic franchisees. You may only award damages the existence and amount of which are reasonably certain and have been proved to you by the greater weight of the evidence. You may not award damages that are remote or speculative.

(Doc. 119 at 27–28.)

Optec argues that Advance Sign failed to establish the third and fourth elements of its tortious interference claim; however, Optec's arguments go also to causation, which is the fifth required element. On February 14, 2012, the Court held oral argument on the causation element.

11

Considering the arguments made at the hearing and the parties' briefs, the parties agree that the relevant evidence relates to Sonic and Roger's decisions to discontinue using Advance Sign's installation services for Optec EMCs. Even after Sonic and Optec entered negotiations for an arrangement whereby Optec would sell EMCs directly to Sonic, Advance Sign provided installation services at several Sonic test locations. Advance Sign points to an email sent by Shawn Klinger, Optec's National Account Manager, to Steve Reed, a Sonic Vice President in November 2006. In this lengthy email, which describes ongoing issues with several EMC installations, Klinger states the following concerning Advance Sign:

> Advance Signs [sic] was contracted by Sonic Corporate for the first 10 locations to provide the signage installations. Against our recommendation they choose [sic] to not use our trained preferred installation vendors and used vendors they had chosen some of which they had never worked with before. We all determined that many installers were incapable of doing the installations and then Advance was forced to change installers. Because Optec air freighted the signs as requested this did cause for the signs to come sooner than Advance had anticipated. . . . Because sign companies were changed this caused for the permit process to start over and the delays with the initial installations. In the signage industry the permitting process is not a standard process especially when it comes to LED signs.

(Pl.'s Ex. 43A.) The email also contains Klinger's recap of problems Optec was experiencing with other vendors. Klinger was apparently trying to persuade Sonic to allow Optec to manage installations itself. At another location in the email, Klinger asks, "So you ask how can we eliminate this from happening in the future? The fix is to in the future allow Optec to manage the whole project." (Pl.'s Ex. 43A.)

Reed, whose testimony was offered by video, testified that Klinger had "probably" prepared the email in response to concerns that Reed had vocalized with respect to missed deadlines in the sign installation project. (*See* Reed Dep. 83–85.) Wasserstrom testified that Klinger's assertion that Advance Sign went against Optec's recommendation was not true. (Doc.

142 at 104.) When Optec and Sonic reached a final agreement concerning the provision of the EMCs in January 2007, the agreement provided that Optec would provide installation services. (Pl.'s Ex. 44 at 1.) Furthermore, by email dated February 7, 2007, Rogers' company notified Optec that it would handle all future installations of EMCs at Rogers' Sonic locations. (Pl.'s Ex. 45.)

### 1.

Initially, the Court addresses Optec's argument made at the oral hearing relating to its Rule 50 motion for judgment as a matter of law that it made at the close of Advance Sign's case-in-chief. Optec submits that the motion should have been granted because at that point in the proceedings Advance Sign had failed to set forth sufficient evidence from which a reasonable jury could find in its favor on the tortious interference claim. Optec contends that Advance Sign could not rely upon the testimony it elicited from Optec's witnesses on cross examination, because those witnesses had not testified at the time Optec moved for judgment. In this situation, however, the Court disagrees.

When Optec made its motion, this Court entertained doubts as to the propriety of granting the motion. The Court, therefore, took the motion under advisement. In his federal practice treatise, Professor Moore explains that, while a Rule 50 motion may be granted at the close of a plaintiff's case-in-chief, "the court should wait until both sides have presented their evidence" "[if] the court entertains any doubt as to the propriety of granting" the motion. Moore's Federal Practice § 50.20[2][d]. Implicit in this proposition is that a court may rely on the evidence that was presented by both sides to determine whether or not to grant the Rule 50 motion.

Indeed, the Sixth Circuit has made clear that Rule 50(a)'s requirement that the nonmovant be "fully heard" before a court may grant the motion includes affording the

nonmovant of the "opportunity to present any available evidence." *Francis v. Clark Equip. Co.*, 993 F.2d 545, 555 (6th Cir. 1993) (relying on comment to Rule 50 for proposition that "[i]n no event, however, should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact"). Thus, even if the Court had found Optec's motion well taken at the time, it would have apprised Advance Sign of the evidence it found lacking and afforded it an opportunity to present that evidence. It would not have been inappropriate for Advance Sign to have informed the Court that it planned to elicit the lacking evidence from the testimony of a defense witness.

**2.**

The third element of a tortious interference claim requires that a party act intentionally with the purpose of interfering with business relationships. While Optec contends that Advance Sign offered no evidence to support this element of the claim, the Court disagrees. The email itself facially requests that Optec be given future installation business, while criticizing Advance Sign. Construed in Advance Sign's favor, the email represents an effort to interfere with Advance Sign's relationship with Sonic.

**3.**

Optec further argues that the jury could not reasonably have found in Advance Sign's favor on the fourth element, that Optec lacked justification for interfering with Advance Sign's business relationship with Sonic. The Court, however, disagrees.

"The fourth element, lack of justification in procuring the breach, requires a plaintiff to present proof that the defendant's interference with the contract was improper." *Andrews v. Carmody*, 145 Ohio App. 3d 27, 32-33 (Ohio Ct. App. 2001) (citing *Fred Siegel Co., L.P.A. v.*

14

*Arter & Hadden*, 85 Ohio St. 3d 171, 176 (1999)). As evidence for the fourth element, Advance

Sign cites Optec's actions in breaching the contracts, the fact that Optec had never performed

installations, Advance Sign's longstanding relationships with Sonic, and Wasserstrom's

testimony that Klinger was not truthful in his email. The Court finds that this evidence provides

a legally sufficient basis for a jury to reasonably find that Optec had no justification to interfere

with Advance Sign's business relationship with Sonic.

First, and importantly, if Wassertrom's testimony is believed, then Klinger lied about

Advance Sign's work in his email. While Optec denies that Klinger falsely accused Advance

Sign, it was up to the jury to credit the testimony it found believable.

Second, several other factors the jury considered to determine justification favor a finding

that Optec was unjustified in its interference. That is, Optec's interest in getting its foot in the

door in a service it had not previously engaged, by falsely accusing Advance Sign of poor and

untimely work, making the accusation to a company that had a longstanding relationship with

Advance Sign and plentiful work, breaching contracts under which it was obligated, and a close

proximity (two months) between the time Optec interfered and the time sonic agreed to permit

Optec to complete the installations.

4.

The fifth element in a tortious interference claim requires that the plaintiff show that the

defendant's actions caused it to suffer damages. In the oral hearing on this issue, Optec relied

upon *Chrvala v. Borden, Inc.*, 14 F. Supp. 2d 1013 (S.D. Ohio 1998) (Marbley, J.), for the

proposition that Advance Sign was required to show that "but for" Optec's interference the

relationship with Sonic would not have ended. Advance Sign, however, argued that *Chrvala*

dealt with a prospective business relationship, as opposed to an existing relationship. In the

instant action, the tortious interference was with an existing relationship, which does not require "but for" causation. Advance Sign's argument is well taken.

Tortious interference with a prospective business relationship, as Judge Marbley explained in *Chrvala*, requires "but for" causation to satisfy the fifth element. However, the Court finds nothing in Ohio law to support the proposition that tortious interference with an existing relationship requires "but for" causation. The Court concludes that Advance Sign presented sufficient evidence that the jury could reasonably have found Optec's actions caused damages to Advance Sign.

For these reasons, the Court denies Optec judgment as a matter of law as to Advance Sign's tortious interference claim.

### III.

The Court next considers Optec's motion for a new trial, or, in the alternative, for a remittitur on damages.

Pursuant to Rule 59, the Court may "grant a new trial on all or some of the issues—and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). In the Sixth Circuit a:

> new trial is warranted when a jury has reached a "seriously erroneous result" as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.,* the proceedings being influenced by prejudice or bias.

*Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045–46 (6th Cir. 1996).

Optec seeks a new trial on the both Advance Sign's second contract and tortious interference claims.

### A.

16

Optec argues that a new trial is warranted on Count Two on the grounds that the jury based its damages award in part on lost profits that were not contemplated by the second contract. Additionally, Optec argues that the damages were based in part on the existence of contracts for which Advance Sign offered no evidence.

Based on the record created at trial, however, the Court cannot say that the jury's award of $3,444,000 in damages on the second contract claim was "seriously erroneous." Optec's argument is essentially that the jury could not have logically reached the damage result based on the evidence in the record. However, as noted in Part II.A.3 *supra*, the $3,444,000 figure was likely arrived at by the jury by multiplying 1400 EMCs sold (from the testimony of Wu) times the selling price of $20,500 per unit, times the 12% commission rate envisioned by the first iteration of the second contract. Accordingly, the Court declines to award a new trial to Optec on Advance Sign's second contract claim.

**B.**

Optec asserts that Advance Sign failed to present evidence of its damages for its tortious interference claim. However, the Court concludes that there was sufficient evidence for the jury's damage determination. As previously discussed, the jury awarded Advance Sign $1,029,000 in damages on the tortious interference claim. As noted by Advance Sign, it reported a gross margin of $734.96 on the installation aspects of the Topeka, Kansas test locations for Rogers. (*See* Pl.'s Ex. 17.) If that number is rounded up to $735 and multiplied by the 1400 units used by the jury in determining damages on the second contract claim, the damage figure of $1,029,000.00 is reached. Accordingly, the jury determined that Advance Sign would have made a profit of $735 per installation and further determined that, in the absence of Optec's tortious interference, Sonic would have awarded Advance Sign contracts to install the 1400

17

EMCs. The Court cannot say that the jury's conclusions in this regard were seriously erroneous,

and denies Optec's motion for a new trial as to Advance Sign's tortious interference claim.

**IV.**

Finally, the Court considers Advance Sign's Motion to Amend Judgment to Include

Prejudgment Interest (Doc. 137). Advance Sign seeks to amend the jury's damage award on

Count Two to include $658,246.05 in interest.

> Pursuant to § 1343.03 of the Ohio Revised Code:
>
> when money becomes due and payable upon any bond, bill, note, or other
> instrument of writing, upon any book account, upon any settlement between
> parties, upon all verbal contracts entered into, and upon all judgments, decrees,
> and orders of any judicial tribunal for the payment of money arising out of
> tortious conduct or a contract or other transaction, the creditor is entitled to
> interest at the rate per annum determined pursuant to section 5703.47 of the
> Revised Code . . . .

OHIO REV. CODE § 1343.03(A). Pursuant to § 5703.47, the Ohio Tax Commissioner

determines the interest rate referenced in § 1343.03(A) on an annual basis.

An award of prejudgment interest pursuant to § 1343.03 is mandatory. *See Lincoln Elec.*

*Co. v. St. Paul Fire and Marine Ins. Co.*, 210 F.3d 672, 693 (6th Cir. 2000). "Although a trial

court judge is bound to apply prejudgment interest principles to the facts as found by the trial

factfinder, the judge makes the additional predicate factual determinations needed to support any

necessary application of the statute." *Id.*

Optec argues that there is insufficient evidence in the record to determine the point in

time at which the monies owed under the second contract became payable to Advance Sign.

Specifically, Optec argues that, even assuming that the second contract contained a provision

requiring Optec to pay commissions within a specified time, nothing in the record indicates when

Optec was paid by Sonic under the terms of their agreement. However, Optec's contention is

18

belied by the record as Paragraph 5 of the supply agreement signed by Advance Sign and Optec in January 2007 provides that "Payment terms will be 25% due from the Franchisee at the time the order is placed and 75% due 15 days from the date the Standard Services are complete." (Pl.'s Ex. 44 at 3.) Accordingly, it is reasonable for the Court to conclude that Optec was paid by Sonic within fifteen days of the installation of the EMCs. Further, as evidenced by Advance Sign's trial exhibit 32, it is reasonable for the Court to assume that Advance Sign was in turn eligible to receive the commission in short order following Optec's receipt of payment. (*See* Pl.'s Ex. 32 ("Commissions are due and payable to Advance Sign Group by the 10th of the month following the end of the month in which Optec Displays ships product for which Advance Sign Group is eligible to be paid commission.").)

The Court therefore will compute prejudgment interest using the following parameters:

- As determined by the jury, a 12% commission was due on each of the EMCs sold by Optec to Sonic. While the jury used 1400 as a basis for determining damages, Advance Sign requests interest only on the 1267 sales evidenced by Advance Sign's Exhibit 73.

- Commission due on each sale is determined by multiplying .12 times the $20,500 EMC purchase price used by the jury.

- In 2006, 49 EMCs were sold; in 2007, 740 EMCs were sold; in 2008, 332 EMCs were sold; in 2009, 109 EMCs were sold; and, in 2010, 37 EMCs were sold. As suggested by Advance Sign, to simplify the calculation, the Court will assume that commissions for all of the sales in a given year became due at the end of that year.

- Interest rates determined by the Ohio Tax Commissioner are as follows: 6.0% in 2006; 8.0% in 2007; 8.0% in 2008; 5.0% in 2009; 4.0% in 2010.[1]

- Given that judgment in this case was entered on March 16, 2011, the 75th day of 2011, the Court will multiply the total annual interest due by 75/365 to arrive at the total due in 2011.

- Interest is calculated at a simple rate, thus the interest due for sales in 2006 remains the same for the years 2007, 2008, 2009, 2010.

---

[1] *See* http://tax.ohio.gov/divisions/ohio_individual/individual/interest_rates.stm.

Applying these parameters, the Court arrives at a sum of $658,246.80 in prejudgment interest. The following table summarizes the Court's calculations:

| Year | EMCs Sold | Revenue | Commission | Interest Rate | Annual Interest |
|------|-----------|---------|------------|---------------|-----------------|
| 2006 | 49 | $1,004,500.00 | $120,540.00 | 6.00% | $7,232.40 |
| 2007 | 740 | $15,170,000.00 | $1,820,400.00 | 8.00% | $145,632.00 |
| 2008 | 332 | $6,806,000.00 | $816,720.00 | 8.00% | $65,337.60 |
| 2009 | 109 | $2,234,500.00 | $268,140.00 | 5.00% | $13,407.00 |
| 2010 | 37 | $758,500.00 | $91,020.00 | 4.00% | $3,640.80 |

After annual interest was determined, the Court multiplied that interest times the given number of years in which it was owed. For instance, the $7,232.40 in interest for 2006 commissions was owed by Optec to Advance Sign for the complete years 2007, 2008, 2009, and 2010, plus for the partial year 2011. The $145,632.00 in interest owed for 2007 commissions was owed in 2008, 2009, 2010, and for the partial year 2011. When the interest figures are totaled in this manner, a total of $658,246.80 is reached as summarized by the following table:

| | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|------|------|------|------|------|-------|
| 2006 Sales | $7,232.40 | $7,232.40 | $7,232.40 | $7,232.40 | $1,486.11 | $30,415.71 |
| 2007 Sales | | $145,632.00 | $145,632.00 | $145,632.00 | $29,924.38 | $466,820.38 |
| 2008 Sales | | | $65,337.60 | $65,337.60 | $13,425.53 | $144,100.73 |
| 2009 Sales | | | | $13,407.00 | $2,754.86 | $16,161.86 |
| 2010 Sales | | | | | $748.11 | $748.11 |
| | | | | | Grand Total | $658,246.80 |

## V.

For the foregoing reasons, Defendant's Motion for Judgment as a Matter of Law (Doc. 134) is **DENIED**; Defendant's Motion for a New Trial or, in the Alternative, for a Remittitur on Damages (Doc. 135) is **DENIED**; and Plaintiff's Motion to Amend Judgment to Include Prejudgment Interest (Doc. 137) is **GRANTED**.

The Clerk is directed to amend judgment in this matter to reflect the above and to add $658,246.80 in prejudgment interest to Plaintiff's judgment as to Count Two.

**IT IS SO ORDERED.**

2-21-2012

**DATED**

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE